Well, may it please the court, my name is Rob Wilder and my colleague here is Curtis Elliott. Three of us represent the appellant, Cary Hood, Inc. I've reserved five minutes for you both. Today we ask you to reverse the court below because it refused to address the best case law and used the wrong factor balancing standard in determining the reasonableness of the bonuses in question. We ask you to consider the manner in which the bonuses were determined by the taxpayers' advisors as a proper key factor to consider. Let me just, just at the beginning, and you can defer this if you wish, but it's, my question would be if we were to adopt formally a multi-factor test as opposed to the length of a reasonable investor test through the lens, would we then be approving the IRS, the tax court's decision on a deferral to the findings of fact and judgment that it made? I don't think so. I think that I'm going to be talking about a lot of different cases. So your argument would be that even if we were to apply the multi-factor test that you would, we should reverse the tax court? Yes, Your Honor, that's going to be my argument and I'm going to flesh it out a little bit, but in a nutshell, well, I guess the first thing I want to say is this. In Dexil, page 23 of the brief, the Second Circuit held that the tax court's failure to consider the executive's compensation from the perspective of an independent investor and to ignore the returns to the shareholders was legal error. In Dexil, the ROE, the return on equity was 25.5 percent and 26.3 percent, which the court said was reasonable. In this case, for the two years, the ROE was 25 percent and, that's not right, 22 percent and 36 percent. In addition, our company, What's the standard of review here? De Novo. What? It's De Novo, Your Honor. I don't understand that. I thought this was a question of fact, which was determined under the multi-factor test by the specifics of the individual case, and we had to find a clear error as to the tax court's finding. Your Honor, I think if the court used the wrong standard, that's a question of law, and that's a De Novo review. Well, that got to my question initially, that, in other words, we have, I came in thinking that we really have one question of law, that is the proper test to apply. Yes, sir. And if we once decide that, then, and I was assuming that if hypothetically, if we were to adopt the multi-factor test, which the tax court applied, then isn't this just a clear error case? I'm not sure that that's right, Your Honor. I believe that under the case law, we always review factual determinations for clear error. Maybe I'm wrong. I think these cases have been resolved, and reasonableness is a question of fact, it seems to me, what is reasonable and what is not. At best, it's a mixed question of fact and law with a sizable factual component, and it's hard to see whatever the test, just speaking purely for myself, how the tax court went wrong in this, because the vision that Mr. Hood puts before us is that this $5 million bonus was all due to his visionary leadership, and there was this vast uptick in profits in 15, the 9th of 2015, 2016, and it was due to his visionary leadership, and, you know, that seemed a little bit vain to me to say that it's all due to me and my leadership, and that the improvement in economic conditions during those years played no part in it, and, you know, to say that this is all one man's doing, and to leave the larger economic context aside, it did seem to me a little bit vain. Your Honor, let me say this. It's too bad we didn't bring Mr. Hood up here so you could take a look at him. He is the least vain man in the history of mankind. Well, I can't take notice of that. My point really is this. I believe the court below found that most of the appreciation and growth was as a result of Mr. Hood. Well, I'm not denying that it took a roll, but the problem is by his own testimony, he said he wanted to get money out of the business because there was going to be a changing of the guard, because his son was not going to take over the business, and so he wanted to get money out of it because his son wasn't going to take it over. Well, you know, okay, but that goes to draining the corporation rather than reasonable compensation, because I can't see whether the compensation. Well, Your Honor, let me say two things about that. One, and going back a little bit to what you said about vanity, I mean, in all these cases that we've cited to you where some highfalutin executive makes a huge difference in the company, you know, I guess they would always seem vain. With regard to taking the money out, if you look at the overall testimony, he did say that, but he said lots of other things that didn't indicate that he was trying to strip the company, and if you look at it this way, Your Honor, in the two years in question, the shareholders got the benefit of 45% of the profits in 2015 and 65% of the profits in 2016, so that you could hardly say he was stripping down the company to feather his own nest. Well, there weren't any. I realize that shareholder benefit comes from appreciation and not just cash dividends. There are a lot of shares where shareholders invest for the appreciation rather than the cash dividend, but, you know, it is odd that there were no dividends paid to shareholders during a 17-year period, even when there were substantial sums available. Well, I think I can clear that up for you easily enough, Your Honor. This case is different than, for example, Home Interiors, which is a Tupperware company where they utilize dividends more freely, but in a capital-intensive business such as this one, the only way to remain competitive is to spend loads and loads of capital on replenishing and growing a fleet of heavy equipment, which is what they've done and always done. That's certainly a legitimate point, you know, up to a point, up to a point, but it is, again, one of those factors in assessing reasonableness. You know, there were plenty of employees, 150 of them, I guess, and they didn't get a cent. Meanwhile, they didn't get a bonus, and meanwhile, he's got $5 million and the employees, plenty of them at least, didn't get any bonus. And so at a certain point, and it's a question of degree, I think, which is one reason I think it's a factual question, because this argument, but the impression I got overall is that the shareholders and the employees were not really sharing in the good times, that it went to Hood himself. And I realize as the CEO, he deserves a bonus, and he deserves the largest bonus. But again, it's a question of degree. Did you get $5 million when the shareholders and employees don't share in the good fortune? That's troubling to me. He took it for himself. Well, let me say several things. This is a closely held corporation, isn't it? Yes, sir. So this bonus was not approved by any outside directors. There wasn't a board of directors the way there is the board of trustees that normally approves these bonuses and gets it out of the red face test. Well, Judge, I mean, there's a great answer to that, I believe, which is this. Yes, it's true that Mr. and Mrs. Hood are the shareholders and the directors of this company, but they were advertent to the fact that they're not experts in the field of taxation. And when Mr. Phillips, the CFO, thought that a raise in bonus was appropriate, they brought in an outside accounting firm. And the accounting firm was the one that performed the analysis and made the recommendation that the bonus be as it was. I understand all that, but that is still different from a board of directors with lots of outside directors who approve a bonus. Even then it can be high, but at least you cover yourself rather than having your own accountant do it. The board of directors is generally comprised of a number of outside directors, and it's a larger group of people. And so with you, you have a closely held corporation, you have to at least ask whether this is reasonable. And then another point I want to raise with you is before the tax court, the tax court found there was no increase in Hood's responsibility or workload to justify this huge increase in compensation. So what do you say about that? That there was, what do I say about there was no increase in his duty? I'm saying that reasonableness can be tested by whether there was a big increase in his workload or his responsibilities. Judge, it's undisputed that this guy worked north of 60 hours a week every week, and there was no way he could work any more than he did. He served the role of president, he served the role of, he was basically, did the selling, did the, supervised all the work that he couldn't have done anymore. Mr. Wilder, the issue, one of the issues that the tax court focused on, at least I think it impliedly, maybe explicitly, was you have all this cash that grew in the corporation, and you made the argument, well, this is a capital-intensive business, and so it needs to have cash. But the question I think the IRS was faced with was, oh, right, he takes out $10 million to take cash out to bring cash to himself. And the question is, why wasn't that done with dividend rather than income? And the answer is, of course, you avoid taxes, you avoid a level of taxes by doing it through compensation, as opposed to through dividends. And it seems to me where the IRS came down and said, we're going to independently review under the multi-factor test the reasonableness of that distribution as income to him, and the remainder would have to be distributed as dividend, which of course would be taxed. Well, I think that the case law is crystal clear, and we've cited many cases that stand for this proposition, especially in a company like this that is capital-intensive. You don't have to give dividends, and it's not... Of course you don't have to give dividends. I'm not talking about beyond the $10 million. I'm talking about the $10 million he chose to take out, which would mean the corporation would not have $10 million in cash, $5 million each year. And so he made the decision to take $10 million out, and that impliedly suggested that he left enough in the business to run the company. So taking $10 million out of the company can be done in all compensation, which he chose to do with the advice of his accountants, probably to avoid taxes, or he could have done half of it in dividends and half in compensation. But the question is, by doing no dividends, then it puts high pressure on whether that $10 million is actually real compensation. And the IRS determined it was not. It was an overstatement of compensation. It was a fair distribution from cash from the corporation. So it's a faulty issue to examine the corporation and say, the corporation needed capital and therefore didn't give dividends. The question isn't whether he made the determination that the corporation could distribute $10 million in cash. The question is whether it comes to him in compensation or in dividends or a combination. And the IRS took issue with only one thing, and that is to load it all up on compensation. It was unreasonable because it did not pay attention to the factors for compensation. Rather, it looked like it was a tax avoidance. Well, Your Honor, I still believe they applied the long statement. I've gone over the time. Can I answer the question? Please. Nevertheless, the court below violated the teaching of 14 cases that were cited. They simply didn't consider the shareholder benefits of the return on equity in the retained earnings. And with respect to the retained earnings, the court found that the cash in the company, after paying the bonuses, increased 15 fold. That's my whole point. It doesn't matter. It's irrelevant. The relevant question is, what about the $10 million in cash that was taken out? And the question is, there's no criticism that you could take it out and there was enough cash left. And also, there's no criticism of the fact the company needed cash because it was capital intensive, a lot of heavy equipment and so forth. So the issue isn't whether the corporation acted properly in distributing $10 million. The issue is whether it acted properly in distributing $10 million as compensation. As distinct from, say, just hypothetically, what they approved is they approved a total of what? $4 or $5 million in compensation. $3.7 in the one year and one point. There's $5 million out of $10 million. Yeah, $5 million roughly. So they approved roughly $5 million as compensation and the rest could have come to him by way of dividend. In other words, that's what they said. And they noticed that dividends, if they wanted to get cash out of the corporation, they could do it through dividends if they wanted. But they chose to do it all through compensation, which provided a tax advantage. And I would say that all the cases we cited, Your Honor, support the notion of what we, I don't know, whatever you want to call it, colloquially called home run pay for home run performance. That he deserved it just like the executives in the other cases. So that gets to the heart of the issue. The question is, what compensation in view of his success, and nobody denies his success, what compensation in view of his success was he entitled to? And the IRS looked at, or the tax court, looked at a bunch of factors and said that the $10 million was overcompensation in context of everything we're talking about. Except it didn't consider everything. It didn't consider the benefit to the shareholder from retained earnings and from return on equity. Where is the shareholder benefit in a $10 million bonus awarded by Mr. Hood to himself? Where is the shareholder benefit in a $10 million bonus awarded by Mr. Hood to himself? The question is, would an investor be satisfied with the performance, notwithstanding the payment of the compensation? And the answer in all the circuits that have considered it would be yes. Well, that's under the seven circuits test. But the multifactor test looks at a bunch of factors that the tax court chose to apply, which was the multifactor test. But he still didn't consider the shareholder benefits. Shareholders didn't get the benefit. If the $10 million is coming out of a corporation, and $5 million was given to the shareholders as dividends, and $5 million was given to the CEO as compensation, then the shareholders benefit. But in this case, the shareholders basically forwent the $5 million that could have been paid in dividends. And the question, nevertheless, is, is that fair under all the circumstances? Well, that's a fair enough question. When you consider the transformative work that Mr. Hood did, that has changed what they were doing completely, went from one line of work to another. And it went from being a highly respected, good company that was a mediocre- It's all undisputed. I mean, it's all undisputed. You've got a good record. They gave you the benefit of all that. Listen, your honor, I'm certainly not trying, I guess I'm arguing with you a little bit. I'm just saying, I think it's legal error that the court- What's the legal error? Applied the wrong test? Yes, sir. You want the sophisticated investor test. I feel like regardless of whether you have- But do you want us to stop the sophisticated investor test? We invited you to consider it, but we believe that whether you determine it's a multi-factor, lens test, or presumptive- Well, if it's a multi-factor, there's no legal error. If you're accepting the multi-factor test, that's what the tax court applied. I don't- The only question left is the clear error on the back part. Well, I believe, your honor, that nevertheless, we still require under the case law to consider the return on equity and the retained earnings, regardless of which test- But that is a fact we review for clear error. Now, we can review the test, appropriateness of which test, the no vote, but you don't plant your feet on what needs to be the sophisticated investor test. You would like it to be the sophisticated- Well, then you don't plant your feet on that. So, you don't say it's error to have done it with the multiple investor test, whatever the other one's called, the multi-factor test. You don't say that's error. Yes, Judge, I am saying it's error not to consider this under any test. He did. He did apply. No, he did not. All right. All right. He considered the multi-factor test. He didn't consider the return on investment and the return on- He considered the- He applied the multi-factor test and ruled against you. I get it, Judge, and what I'm saying is, I believe that the case law, all the case law we cited, stands for the proposition that he has to consider the ROE and the retained earnings. The retained earnings are irrelevant in the issue in this case, because the issue in this case is just $10 million. It's not- There's no suggestion that he should have taken less out of the company or more out of the company. The question is, should he have taken $10 million out as compensation? I think we're- He's the only- He's the only stockholder,  He could have. The reason he didn't is because he would have paid another level of taxes. Well, that's not supported by the record, Your Honor, and that's not what his advisor said. Remember- That's the law. There are tax implications- That is a tax implication. Whether it comes out by way of dividend or by way of bonus. That is- That's the tax implication. That's the government's interest in this thing. I understand. And they think the bonus is too high. I thought you also raised here whether the appropriateness of the penalty in the 2016 year. Maybe we can get to that on the rebuttal. I want to cover that. We want you to cover it, but you're over time here. All right. Thank you, sir. May it please the court, Robert Bramman, the Commissioner of Internal Revenue. I'm confident the court understands our case, and that I spent too much time preparing these comments. If there aren't any questions, I'm going to take a couple of minutes. As the court understands, there's no question that Mr. Hood was entitled to all the profits. He was the 100% owner. The issue in the case isn't Mr. Hood's individual income tax liability. It's Clary Hood Incorporated, a corporation's income tax liability. And it's entitled to pay Mr. Hood as dividends or as salary, but it's only entitled to deduct, in computing its taxable income, a reasonable amount of compensation. Do you contend that the reasonableness question for purposes of the deduction is subject to a clear error standard of review? Absolutely, yes. The reason why that is so easy in this case is because  of determination of how much was reasonable. Took evidence from three experts. Taxpayer offered two. Taxpayer of the corporation offered two experts. The tax court wasn't much impressed by either of their testimony and gave them no weight. The government... You said that it was not a founding of fact, what the tax court did? It was a credibility. Well, it was reasonable. It was reasonable. It was a factual founding. Yeah, the tax court is entitled to reject or accept expert testimony, accept some parts and reject other parts. Yeah. The tax court rejected the testimony of the two experts that the corporation offered. You know, it's probably not our role to question what I'm about to ask, but it seems to me, as I understand the tax court, it allowed a bonus of, or income of 3.7 million in the 2015, and then about one little over a million the following year. And the reason it... The reason the following year it allowed so little is that there was no analysis provided. In other words, the corporation provided quite a few reasons for giving the 5 million in 2015. The IRS thought... Accepted or reviewed those reasons and thought it was reasonable enough so that a penalty would not be imposed. And reduced the 5 million to 3.7. Seems to me that it would have been better just to leave it at 5 million. That was the judgment of the corporation. But the IRS chose... I mean, the tax court chose 3.7 million based on the expert testimony. But my question focuses on the year 2016, when it allowed a bonus of 1.6 million. And even then there was no analysis. What did it base it on? In other words, my view would have been, given the 5 million in 2015, he didn't make any showing for 2016. He just said the same factors apply. And there's no evidence they did anything affirmative to look at any new cash flow or new jobs or new prospects or whatever. In other words, they just said, we're going to repeat what happened in 2015. Yet the IRS allowed a million-dollar bonus or a million-plus bonus in 2016. I suppose that's just a tribute to the general success of the corporation. I think I can play on this. I'm saying that again, I couldn't hear you. I think I can explain all this. When the IRS did the audit, it only allowed him about $500,000. It only allowed the corporation about a $500,000 deduction for his compensation. In what year? In 2015 and 2016. Both years? Both years. That's what the IRS auditor allowed. When it got to tax court, the tax court computed it all over from the beginning. It didn't just defer to what did the IRS do in the audit. The numbers Judge Niemeyer gave you are what the tax court did. Yes. Those are correct. Yes. I'm getting to how those came to be. The commissioner's expert, Mr. Fuller, conducted a full economic analysis of how big was the company, how strong were its revenues. What was its equity? What were other grading and excavation contractors paying their top executives during the time period? He concluded that the maximum reasonable compensation for Mr. Hood for each year was about $1.3 million. The company also said, in 2015, we were also catching up for all those years that we didn't pay him enough. Also, we're catching up for all those years that he and his wife personally guaranteed our surety bonds. Our expert, Mr. Fuller, tried to assess those figures and came up with about $1 million for each. $1 million for back pay for 15 years under compensation and $1 million for the personal guarantee surety bonds. That's how he got to $3.6 million in 2015. Just with a bare $1.3 million in 2016, no extra. What you're pointing out is that the tax court found roughly the same bonus for each year, roughly at the $1 point something million, was compensation for that year. In 2015, there was some catch-up money in addition. Yes. Even if the total is $5 million in one sense or another, it's important to keep each year separate. Hey, one question that I had is when we're talking about reasonableness, we're talking about reasonable compensation. You have to look at that word, compensation, and it means compounds. You have to ask compensation for what? What did he do that hadn't been done previously? How did he earn or how did he deserve the compensation? That was the link that seemed to me to be missing here because it didn't seem to me that there was a relative increase in his workload or duties and responsibilities. And if there's no relative increase in that, why then should there be a relative increase in bonus? But you have to link the word compensation up to what did he do to earn it? What did he do to deserve it? Do you see what I mean? Yes, that's right. The regulations, in fact, specify it has to be compensation for personal services. Now, my friend will argue that it's normal when a company does very well to give its top executives a bonus. So there is some basis. No one's disputing that. No one's disputing it. It's a question of degree and it's a question of size. And because of the fact that it's a question of degree, that's the sort of thing that belongs right in the province of the fact finder. Absolutely, yes. I want to return to one comment I made earlier. Earlier, I said the reason why this factual determination is so easy in this case is because the tax court accepted the commissioner's experts analysis and came up with those numbers that we just discussed. That was Mr. Fuller. Fuller, yes. The other two experts, well, my friend hasn't been talking about them because the tax court threw out their analyses. So there's no competing number. The tax court concluded with Mr. Fuller that they were entitled to deduct, you know, 3.6 million one year, 1.3 million the next year. My opponent is not offering any other number. Did Mr. Fuller give those numbers or did the tax court judge pull them out of the air? Mr. Fuller came up with those numbers. Those are Mr. Fuller's numbers? Yes. And the judge adopted them? Yeah, with one little wrinkle. Mr. Fuller came up with two numbers for 2015. For 15? For 2015, yes. He concluded that it was appropriate to compensate Mr. Hood for the personal guarantee of surety bonds, but he also thought it might be the case that in the comparative data that he that are owned by one person, the owner provides a personal guarantee for a surety bond. So that kind of compensation was probably already included in the comparative debt. Mr. Fuller told the tax court, you might be double accounting if you include that, but I can't be sure because it's not solid in the comparative debt. The tax court got to pick which of his two figures it liked there. Tax court picked the higher. Yes. They picked the one most favorable to Mr. Hood. That's right. And they're not complaining about that. It is a substantial, I mean, that guarantee, I've come across that several times, and that guarantees very substantial risk for the contractors. And it's, of course, necessary because they're small companies and they don't have a lot of leverage. And so they put their own personal homes and estates up. But your suggestion is that it was unclear whether that factor was included when looking at other companies' compensations because they had not broken that out. Right. But this corporation, for example, didn't separate. And the IRS auditor hadn't allowed him that. That's right. It was kind of tense. I mean, these risks and everything, every time he signs a contract, he's guaranteed those performance bonds. Seems to me like that's really something. But there's worse than that. Neither here nor there. I mean, we got the benefit of it in the analysis that they had litigated before the tax court to get it. After we proffered our commissioner's report, we had to concede. But what about those penalties? In 2015, you gave him the tax court, gave him credit, gave the company credit for acting in good faith. And for 2016, you denied that and said they acted in bad faith. And so you imposed a several hundred thousand dollar penalty on them in 2016. He made the distinction between 15 and 16. Penalty is automatic. It's mathematical. Well, I thought it was based on good faith. It's based on good faith. That's the reduction of the penalty. The penalty is imposed automatically if it's more than 20%. If a corporation understates its correct tax liability by more than 10%, which after the tax court redetermined is mathematically correct, then there's a 20% penalty on the understatement. These are confusing. There are at least three ways to reduce the amount of the understatement. In section 6664, there's a reasonable cause and good faith exception. That includes... That's the one that's an issue here. It's one of them. There's two of them. Yes, there's two, but not the third. All right. Okay. That's the one that says if you went to get professional advice and you made full disclosure and you followed the advice... And if the people are competent or the advisors are going to be competent. That's one of the elements. Now, the commissioner's position in tax court was that they hadn't done this. They hadn't gone to their accountants to try to figure out how much compensation is reasonable to pay our guy. How should we report it? Our position was that they went to accountants to figure out how to create a paper trail to look good in case they got audited. But the tax court rejected our position, found that their effort was good enough. Which gave them the good faith exception.  Well, so in 2016... For 2015. But the effort was... The advice they got from their accountants was, if you want to make up this back pay from 2014, you can with bonuses. And so that's what they did. But they completely remediated the back pay with the 2015 bonus. So why are they giving them another $5 million bonus in 2016? There was no explanation between the accounting firm and the company about how... On that question, because I remember seeing something. The company said that they were going to do it installments. Instead of giving everything in 2015, they were going to do some in 2016. So their argument would be... I don't know if this is legit. That's not going to be my question. But their argument was, we've been underpaid and I didn't get my bonus and so forth in the past. So I'm going to give myself a bonus of $5 million in 2015 and $5 million in 2016. Which represents the catch-up and the appropriate bonuses. And so all the work I did to justify my... To justify this in 2015 would carry over to 2016. I think that's their position. And my question is, can you... Into the future, that determination, that compensation? I think they could have. But I didn't see that argued in the tax court record or in the briefs in this case. That they argued the underpayment from prior years was more than $5 million. No, I didn't want to suggest that. What I wanted to suggest is that I thought they said they were going to do it in installments. I didn't see that in the record. I think they could have. If you find it in there, I think that possibly they could. If they did it in installments, you'd go along with it. I need more... But they have to show that what they... I remember them saying in 2016, the accountant said, we did it the same way. There was hardly any evidence on this. There weren't emails. Did he not say he did it the same way? There weren't spreadsheets they said exchanged back and forth. Their witnesses took the stand and my friends asked them, did you do the same thing in 2016? And they said, yes. No, but that's a pretty broad piece of evidence. But my point, that is the point I would make. That statement, we did it the same way, that adopts everything they did in 2015. We did it the same way. That adopts everything. So if they did adopt everything, if they did it the same way, how can you make a distinction, you being the tax court judge? How can you make the distinction between the two years on the good faith exception? For this situation... And say it was good faith in 2015, but bad faith in 2016 when they did it the same way. This situation where the point is we are remediating prior undercompensation. They needed to have some discussion about, have we remediated the undercompensation? How much undercompensation is left to remediate in 2016? Let me ask you this on that. That's my whole first question. I assume that they thought the $5 million was not complete in 2015. In other words, it was not adequate. They were going to spread it to 2016. If that is the fact in the case, would that be sufficient? Because they did the analysis once and they came up with X. And they concluded, let's assume they came up and said, we want to take $10 million out of this corporation. Now, I'm not sure their intent is as pure as that, because I think he wanted to take cash out because he's going to pass it on to some employees. But if they concluded in 2015 that it was OK to take this $10 million out, and we're going to take five this year and five next year, wouldn't the rationale that was developed in 2015 also be sufficient for 2016? I'm not sure it would be sufficient, but it would certainly make a difference. It would be a relevant fact. Something I want to look at. I did not see that in this record. I'll let them pass that on to me. Well, one thing you would want to do is if we took the idea that if you give a good faith exception in one year, you had to give it in all subsequent years, that would discourage the commissioner from giving a good faith exception at all in the first place, if it felt that it was tying its hands for all future and subsequent years. It's true. I mean, frequently tax situations are annual events that recur. And if you get good advice... That's right. I mean, you very often find many cases where a particular allowance is made for one year, but not for another year, and for the reasons that the taxpayer is pushing the envelope a little hard. And if we took the position that whenever an allowance is made for one year, it has to be made for all future and subsequent years, that's not going to redound to the benefit of taxpayers. The IRS is going to say, well, as a protective measure, we better not give the allowance this first year. You see what I'm saying? Yeah, I've got something and maybe this is tripping my memory. It looks to me, I'm now just looking at some notes here. As compared to Mr. Hood's actual compensation for the time period, they concluded that Mr. Hood was owed $7.14 million to remedy the past undercompensation. That apparently was at JA 1835. Phillips suggested $5 million be paid to Hood in 2015 with the balance to be paid in future years. That was at the same place. I don't know if that was carried through or what happened. I haven't traced all of that, but the $5 million was paid and they calculated a sum higher. My question would be, if that were in fact their plan for 2016, it seems to me, if they came forth sufficient defense, a justification, a good faith for their 2015 number, and then they said, we did the same thing for 2016, would that present a different picture? That might have been a good argument that they didn't make. Didn't see that in the tax court briefs, in the tax court's opinion or in the briefs in this court. I mean, you have to come back. And I just had one last point. At the beginning of the argument, we discussed the standard of review for the facts and circumstances issue. That's the standard review for the reasonable cause defense also. Tax court was not impressed by their case that they got professional advice in 2000. I mean, we can counsel, excuse me, we can juggle these factors any way we want. We can say, oh, this one, this one, and this one, A, B, C, D. Then we're making ourselves into a super tax court. And it seems to me, we're really straying basically from the standard of review, because it's like the same thing with an abuse of discretion standard, is an appeals court doesn't always say it would reach exactly the same conclusion, but still there's no abuse of discretion or still there's no clear error. And that's part of the force that standards of review have. But I never got a question, I never got a response to my earlier question about whether if we are going to say that giving an allowance or allowing a deduction in one year, it doesn't tie the commissioner's hands for all future years if it seems like the taxpayer is pushing the envelope. And I worry about it making the IRS gun-shy about ever giving an allowance to anybody for anything if it's going to bind them in the future or operate with presumptive force. Do you see what I mean? Yes. Every year stands on its own officially. Every year stands on its own, but some facts and situations may carry over from one year to the next. But the choice is between good faith and bad faith. Government doesn't have to prove bad faith. The taxpayer is supposed to prove good faith, and if the government says you didn't prove good faith, it's bad faith. It's only choices. One or the other, isn't it? I think the standard is good. You said they were acting in good faith in 2015, but didn't act in good faith in 2016. Even though they did the same thing. The term bad faith doesn't appear in the statute or the regulations or the caseloads. It's a matter of the penalties. The penalty is automatic. Yes. Penalty is automatic, and they can avoid a penalty by showing some good faith. Yes. Reasonable cause and good faith. Thank you. If there are no more questions. Mr. Wilder? I'd like to address a couple of things. One, there's a misunderstanding, and the court has brought into an argument that the government made that this was largely a makeup compensation enterprise that we did with bonuses. What happened was, though, the CFO of the company, Mr. Phillips, who was a CPA but not a tax expert, felt that Mr. Hood had been underpaid, and his analysis was how there should be a catch-up. When he knew that he's not a tax expert, so he got Elliot Davis, who the court found decredible, honest, and believable to look at it. I would just like you to look at JA 1842, which is what we call the orange worksheet, which is what Stacey Stokes, the tax partner for Elliot Davis, put together. And his recommendation for the bonus and his willingness to sign off on it was strictly based on the ROE analysis, not the catch-up. So, with respect to the authority we had, the government... Well, I thought, didn't you present your case to the tax court on the basis that some of the... that the 2015 bonus was in part for catch-up? It certainly was a fact. It certainly was a fact. And you presented that as a fact. The reason I say this is because what you're just now saying, there's a memo in here from Mr. Phillips that says... basically says... took position that a corporation compensates for previous years beginning in the year 2000. And they said base pay $200,000 a year plus 5% increase, bonuses, etc. Bonus due on 5-31-15 is $7,141,000. Pay $5,000,000 in 2015, balance in future years. Oh, that's right, Judge. Yes, you are absolutely correct. And that's your exhibit, right? Yes, sir. What I'm saying is that in addition to that, the tax accountants felt that the better reason to award the compensation bonus was the ROE analysis, and they relied, among other things, on H.W. Johnson. And to that point, first of all, my understanding is the taxpayer doesn't have to fact-check his advisors. And the fact in this case is the same exact precise people who the court found to be honest, credible, and competent in 2015, he ignored in 2016 when it came to the penalty. And, you know, we've cited in the brief the different testimony that was given, but just to give you one of them, Mr. Phillips testified, J.A. 332 to 336, that he went through the same exercise precisely in 2016 as he did in 2015 with Elliott Davis, that they had meetings that were literally the same type of meetings and the same types of analysis that they did in 2015. And every single soul who was found credible and honest in 2015 testified that they did exactly the same analysis in 2016. But the point is that it's the cumulative amount of the bonuses that are being considered. The 2016 calculation wasn't just undertaken in a vacuum. It's undertaken in connection with the 2015. And the question by the time of 2016 was whether the cumulative amount of the bonuses was reasonable or judged under a clearly erroneous standard. But the context was different in 2016 because as a matter of background, you had the 2000, you had the 2015. And so the tax court was faced with the question of looking at these years in combination, 2015 and 2016. Was that compensation reasonable? But nevertheless, when it comes to the penalty, as long as the taxpayer acts in good faith based on the advice of their advisors, they still shouldn't be penalized. Now, one thing I want you to, that two things. How much did that penalty work in 2016? What are we talking about here? 280. $280,000. And so my point is the tax court in its opinion said, you know, focused in on saying that there was no substantial authority because he quoted the tax advisor, quoted Menard. But he left out the fact that he also relied on H.W. Johnson, which nobody could claim as an outlier. There was substantial. There was substantial authority. And I'm 30 seconds over. Can I finish? Thank you, Mr. Wilder. Judge, can I say one more thing or am I done? Go ahead. Thank you. My understanding is that if the taxpayer puts on Schedule E, discloses the compensation on Schedule E, which we did, then there only has to be a 20% chance of success in the substantial authority upon which they relied. And certainly, H.W. Johnson and all the other cases decided and agreed. They're not outlier cases. There would be substantial authority. So the penalty should not apply. Thank you, Your Honor. All right. Thank you. After the court shakes hands with counsel, we will move into a final case. Thank you.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Robert B. King